

**FILED**
Jul 23 2015, 8:10 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Kimberly A. Jackson<br>Indianapolis, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana |
| | Michael Gene Worden<br>Deputy Attorney general<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Shawn Wilson,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | July 23, 2015<br><br>Court of Appeals Case No.<br>49A02-1409-CR-673<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Kurt M. Eisgruber, Judge<br><br>Case No. 49G01-1402-MR-007060 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Daniel Jaffke was working as a pizza-delivery driver when he was shot to death and his black Jeep was stolen from an apartment complex on the south side of Indianapolis. Jaffke's Jeep was soon discovered in a laundromat parking lot located very near Shawn Wilson's stepmother's house, where Wilson appeared

the night of Jaffke's murder saying that he had just shot a man on the south side and had used the handgun that was—at that point—sticking out of his waistband. One of Wilson's fingerprints was found inside Jaffke's Jeep. Wilson was charged with murder; felony murder; robbery as a Class A felony; and carrying a handgun without a license, a Class A misdemeanor enhanced to a Class C felony due to a prior conviction. The State also sought a sentencing enhancement for use of a firearm in the commission of the offense. A jury found Wilson guilty of all charges. At sentencing, the trial court merged felony murder into murder, and reduced the robbery from a Class A felony to a Class C felony to avoid double-jeopardy concerns. The trial court also imposed the five-year use-of-a-firearm sentencing enhancement, for a total sentence of sixty-five years to be executed in the Indiana Department of Correction.

[2] Wilson now appeals his convictions and sentence, contending first that the trial court abused its discretion in preventing Wilson from cross-examining a witness on prior inconsistent statements he had made during a deposition. Specifically, Wilson argues that the witness's deposition testimony that he had been arrested once before when, in fact, he had been arrested four times should have been admitted under Indiana Evidence Rules 607, 616, and 608(b). We find that these rules do not support the admission of the witness's prior inconsistent statements. Wilson also contends that several statements made by another witness during her deposition—that she had heard someone say that he and Wilson had committed the offense; and had heard another person say that she had been asked to dispose of the weapon and had done so—should have been

admitted as hearsay-exception "statements against penal interests" under Indiana Evidence Rule 804, but for the trial court's determination that Wilson had not shown those individuals were "unavailable" as required by that rule. We agree that Wilson did not make the requisite showing of unavailability and the hearsay statements were, therefore, inadmissible. Wilson additionally argues that the evidence is insufficient to sustain his convictions. Finally, Wilson challenges several aspects of his sentence. Finding no error, we affirm Wilson's convictions and sentence.

## Facts and Procedural History

[3] On the evening of January 31, 2014, Daniel Jaffke, who supplemented his income as a machinist by working as a pizza-delivery driver for Papa John's Pizza in Indianapolis, was shot and killed by a single gunshot wound to the chest. Jaffke had left Papa John's at 6:42 p.m. in his black Jeep Grand Cherokee to deliver two separate pizza orders to Capital Place Apartments, an apartment complex located on the south side of Indianapolis approximately five minutes away from Papa John's Pizza. He delivered the first order to Anthony Landrum. Approximately one-half hour later, as Landrum was carrying the now-empty pizza boxes to the dumpster, he saw Jaffke "on his knees and his elbows" in the apartment-complex parking lot, his Papa John's visor and empty pizza delivery bag on the ground nearby. Tr. p. 60. Landrum approached and asked Jaffke if he was alright, but Jaffke was unresponsive; Landrum then went back into his apartment to get his brother, who called 911. Jaffke was

transported by ambulance to Eskenazi Hospital, where he was declared dead. An autopsy revealed that the single gunshot wound in the middle of his chest was from a .32 caliber "slug," which had remained inside the body. State's Ex. 13; Tr. p. 312-13.

[4] On the evening of the murder, another resident of Continental Court, Vicky Penrod, was in her bedroom, which overlooked the parking lot, with the window cracked open. At approximately 6:45 p.m., Penrod heard a male voice say, "[O]h God, oh God no" in a "begging and desperate tone." Tr. p. 68. She then heard a single gunshot and a vehicle door close. Penrod looked out her window and saw the taillights of the vehicle exiting the apartment complex. Dispatch received a 911 call saying that there was a black Jeep with a Papa John's sign on it speeding westbound on Epler Avenue crossing Bluff Road. *See id*. at 251-52.

[5] Sometime between 8:00 and 8:15 p.m. that evening, Shawn Wilson arrived at the home of his stepmother, Betty Booher, who lived at 1609 South East Street with three other adults: William Sullivan, Barbara Cooper, and James Workman. Workman came out of his bedroom when he heard people talking, and he heard Wilson say that he had done "somethin' real bad" – that he had "just shot a man on the southside." *Id*. at 131. Wilson was crying and appeared "scared to death." *Id*. at 176, 167. Wilson went on to say "I got him with this right here" while patting his stomach or waistband area. *Id*. at 132-33, 156-57. Booher saw the butt of a handgun. *Id*. at 179. Wilson did not have a valid license to carry a handgun. *See id*. at 309-10 ("[The State]: . . . Detective

Vaughn, . . . are you able to determine by checking records whether or not the Defendant has a license to carry a handgun? [Detective Vaughn]: Yes. [The State]: And does he have such a license? [Detective Vaughn]: No.").

[6] Theresa McCool worked at a laundromat at 1601 South East Street, very near Booher's house. When McCool left the laundromat at 8:15 p.m. the night of Jaffke's murder, she saw a "dark color" Jeep parked near the laundromat. *Id*. at 188. The Jeep had not been there when she took the garbage out at 6:00 p.m. that evening. But it was still there when she came in for her shift at 7:50 a.m. the next morning. After hearing a news story giving a description of Jaffke's vehicle, McCool called the police to report the Jeep. The Indianapolis Metropolitan Police Department (IMPD) confiscated the Jeep and had it processed for fingerprints by a crime-scene specialist. Wilson's left thumbprint was found on an automobile-insurance identification card inside Jaffke's Jeep. *Id*. at 262; State's Ex. 86, 87.

[7] On February 5, several days after hearing Wilson tell Booher that he had shot a man, Workman contacted IMPD and reported the incident, requesting that the police set up a meeting with all four of the adults living at Booher's house. On February 10, the police took each of their statements separately.

[8] Shortly thereafter, a person identifying himself as Wilson called Detective Michael Condon, one of the IMPD detectives working on the case. Wilson, calling from telephone number 970-5xxx, asked Detective Condon why the police were looking for him, and the detective explained that "his name came

up involved in a shooting and [the detective] asked him if [he] could meet him." Tr. p. 244. Wilson responded that "he would turn himself in the next morning." *Id*. But Wilson did not turn himself in the next day, and when Detective Condon tried calling Wilson at 970-5xxx, the call went straight to voicemail. Thereafter, the detective obtained a warrant to "go up on the phone," in order to use GPS tracking to track the location of Wilson's phone. *Id*. at 246. Tracking the phone in this manner led the police to a house on Byrkit Street, where Wilson eventually surrendered on February 13.

[9] According to Lisa Davis, a friend of Wilson's, Wilson had told her sometime around February 12—the day before he was arrested—that the shooting was an accident and that he did not mean for it to happen. *See id*. at 278.

[10] Wilson was charged with murder; felony murder; robbery as a Class A felony; and carrying a handgun without a license, a Class A misdemeanor enhanced to a Class C felony due to a prior conviction.[1] *See* Appellant's App. p. 27-32, 97-99. The State also sought a sentencing enhancement for use of a firearm in the commission of the offense. *See* Ind. Code Ann. § 35-50-2-11 (West 2012).

[11] Before the jury trial, the trial court addressed the State's motion in limine, which requested that Wilson be instructed not to mention—among other things—"Any questions, testimony, or evidence of prior uncharged or charged

---

[1] At the end of the trial, the State dismissed the Class C felony handgun enhancement, *see* Tr. p. 365, and Wilson was ultimately sentenced on carrying a handgun without a license as a Class A misdemeanor. *See* Appellant's App. p. 16, 18 (Abstract of Judgment and Sentencing Order).

criminal acts of any State's witness which is not admissible pursuant to Indiana Rule of Evidence 609." Appellant's App. p. 87. Wilson argued that he wished to cross-examine Workman on his deposition statements regarding his prior criminal history; in particular, Wilson alleged that Workman had stated he had only one prior arrest when, in fact, he had been arrested four times. Wilson aimed to show that Workman's testimony was not credible because "he lied . . . in a sworn deposition and he's just as equally likely to lie under oath here in court." Tr. p. 10. The trial court granted the State's motion in limine on this issue, prohibiting Wilson from cross-examining Workman on the number of prior arrests but authorizing Wilson to make an offer of proof of this evidence.

[12] Then, during the cross-examination of State's witness Lisa Davis, Wilson attempted to cross-examine Davis regarding statements that Amanda Ball and William "Tom Tom" Brown had made to Davis at the Cossack Club, a motorcycle clubhouse, a few days after the shooting. *See id*. at 279. As seen from the colloquy below, the State objected to this testimony as hearsay, and Wilson argued to the court that the testimony was admissible as statements against penal interests:

> [Wilson]: My understanding is that night [Brown] was the one that's really doing most of the talking?
> [Davis]: Yes.
> [Wilson]: [Wilson]'s not saying too much?
> [Davis]: Right.
> [Wilson]: But [Brown] indicates to you that he and [Wilson] were involved in that incident; is that right?
> [Davis]: Yes.

[Wilson]: But he didn't specifically say what their involvement was?

[Davis]: Right.

[Wilson]: Now, I understand you also overheard another woman at the club named Amanda Ball, you overheard her talking?

[Davis]: Yes.

[Wilson]: And you heard her indicate –

[The State]: Judge, at this point I'm going to object to [Wilson's counsel] stating hearsay to the witness.

[Trial court]: It is. I don't know how we get around that.

[Wilson]: Well, Judge, it's a statement against interest. Both of these witnesses are admitting that they committed criminal offenses.

[Trial court]: No, I view it as hearsay. . . .

* * * * *

[Trial court]: You've got to demonstrate unavailability first, beyond all the other problems that you create, but unavailability isn't just that he's not here.

[Wilson]: Okay. Well, I mean, if you like we can – I'll reserve my cross for the morning and I will see if I can have my investigator serve William Brown to get him in here tomorrow.

* * * * *

[The State]: He's never been a listed witness by the defense, Judge. The State would object.

* * * * *

[Trial court]: Was he ever a potential witness?

[The State]: No.

* * * * *

[The State]: The problem being 804(b), that it requires the declarant to be unavailable and that's defined in 804(a). And none of the things that the defense would have to show, and it is his burden to show that the witness in this – in this case witnesses, since he's trying to get in hearsay from Amanda Ball and William Brown, that they are unavailable, and you can't make that showing because he's never listed them as a witness and he's not tried to get them to come to court, he's

not subpoenaed them, and he can't make the showing. So 804 doesn't apply because they are not unavailable as defined by the rules of evidence.

* * * * *

[Trial court]: . . . [B]ecause he's unavailable, or because we have a lack of finding of unavailability, clearly we're running into hearsay, and I don't see – I don't see a way around it. I can let you make an offer of proof if you want to try to stand on that in the record for the Court of Appeals.

*Id.* at 279-89. Thereafter, in his offer of proof, Wilson stated as follows:

Ms. Davis would acknowledge that she overheard Amanda Ball, who goes by the nickname "Wallet," acknowledge[] that she disposed of the weapon used in this incident and that it was Tom Tom who had asked her to get rid of the gun. . . . That night at the clubhouse . . . Tom Tom did a lot of showboating about what had happened with the pizza driver. He told h[er] specifically that he and [Wilson] had done it, although he did not give specific details.

*Id.* at 289-90.

[13] The jury found Wilson guilty on all counts. At the sentencing hearing, the trial court merged felony murder with murder, sentencing Wilson to fifty-five years, enhanced by five years for the use of a firearm. The trial court also reduced the Class A felony robbery conviction to a Class C felony and imposed a four-year sentence on that conviction. Finally, the trial court sentenced Wilson to one year for Class A misdemeanor carrying a handgun without a license. All three sentences were ordered to be served consecutively for an aggregate sentence of sixty-five years executed in the Indiana Department of Correction.

[14] Wilson now appeals.

# Discussion and Decision

Wilson raises three issues on appeal. First, he contends that the trial court violated his Sixth Amendment rights and abused its discretion in its limitation of Wilson's cross-examination and presentation of evidence. Specifically, he argues that the trial court abused its discretion in (1) prohibiting Wilson from cross-examining Workman regarding his understatement during his deposition of the number of times he had been arrested and (2) excluding on hearsay grounds statements made to Lisa Davis regarding the disposal of the gun used in Jaffke's murder and evidence that another person—William Brown—was also involved in the murder. Next, Wilson argues that the evidence is insufficient to prove that he committed any of the crimes for which he was convicted. Finally, Wilson challenges his sentence, arguing that the trial court erred by vacating felony murder rather than merging it into murder; furthermore, Wilson contends that the oral and written sentencing orders conflict as to whether Wilson was sentenced on robbery as a Class A or Class C felony, and whether the "use of a firearm" charge was merged into or was a sentencing enhancement to the murder.

# I. Evidentiary Challenges

A trial court has broad discretion to admit or exclude evidence, including purported hearsay. *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014). We therefore disturb its ruling only if it amounts to an abuse of discretion, meaning the court's decision is clearly against the logic and effect of the facts and

circumstances or it is a misinterpretation of the law. *Id.* Even if the trial court's decision to admit or exclude evidence was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Leandrew Beasley v. State*, 30 N.E.3d 56, 64 (Ind. Ct. App. 2015). An error will be found harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. *Id.* at 67. The Court of Appeals may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though it was not the reason enunciated by the trial court. *Robey v. State*, 7 N.E.3d 371, 379 (Ind. Ct. App. 2014), *trans. denied*. We do not reweigh the evidence and consider the evidence most favorable to the trial court's ruling. *Id.*

## A. Cross-Examination of Workman

[17] Wilson contends first that the trial court abused its discretion and violated his Sixth Amendment right to cross-examine witnesses in refusing to allow him to cross-examine Workman regarding his deposition testimony, in particular his understatement as to the number of times he had been arrested. The right to cross-examine is "one of the fundamental rights of our criminal justice system." *West v. State*, 755 N.E.2d 173, 183 (Ind. 2001) (quoting *Pigg v. State*, 603 N.E.2d 154, 155 (Ind. 1992)). However, "trial judges retain wide latitude . . . to impose reasonable limits . . . based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* at 183-84 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

[18] At trial, Wilson did not cite any specific rule of evidence in support of his argument that he should have been permitted to cross-examine Workman on his deposition testimony. On appeal, Wilson admits that this evidence was not admissible under Indiana Evidence Rules 404(b) and 609, conceding that "extrinsic evidence of the acts for which [Workman] was arrested and not convicted would not be admissible." Appellant's Br. p. 15. Instead, Wilson appears to argue that the evidence was admissible under Indiana Evidence Rules 607, 616, and, primarily, 608(b). Rule 607 provides that "Any party . . . may attack the witness's credibility." And Rule 616 provides as follows: "Evidence that a witness has a bias, prejudice, or interest for or against any party may be used to attack the credibility of the witness." Neither of these rules of evidence provides any support for Wilson's contention that that he should have been permitted to cross-examine Workman.

[19] Wilson's argument that "Workman's lies about his criminal history during the deposition established his interest in minimizing his own culpability in this prosecution[,]" Appellant's Br. p. 14, is a nonstarter, as Workman has no culpability in this case. We also fail to see how Workman's inconsistencies as to the number of times he was arrested is somehow relevant evidence of "bias, prejudice, or interest . . . against" Wilson.

[20] Also inapposite is Rule 608(b), which provides as follows:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if

they are probative of the character for truthfulness or untruthfulness of another witness whose character the witness being cross-examined has testified about.

The first sentence of subsection (b) is clearly irrelevant as it deals only with criminal convictions, and here Workman's understatement as to his number of arrests but not convictions was at issue. The second sentence, however, is also irrelevant insofar as it states that the court may allow "specific instances of conduct" to be inquired into if they are probative of the character for truthfulness of *another witness* about whom the witness being cross-examined has testified. In other words, this rule would apply only if Wilson wanted to cross-examine Workman with regard to the character for truthfulness or untruthfulness of another witness—and Workman had already testified on direct examination about that witness's character for truthfulness. We find that the trial court did not abuse its discretion or violate Wilson's Sixth Amendment right to cross-examination in prohibiting Wilson from cross-examining Workman regarding his deposition testimony.[2]

---

[2] Even if we were to find that the trial court abused its discretion and violated Wilson's Sixth Amendment rights by preventing him from cross-examining Workman on this point, we find this error is harmless beyond a reasonable doubt under harmless-error analysis. *See Hall v. State*, --- N.E.3d --- (Ind. July 2, 2015). In determining whether an error is harmless, we consider several factors: (1) the strength of the prosecution's case; (2) the importance of the witness's testimony; (3) whether the testimony was corroborated; (4) the cross-examination that did occur; and (5) whether the witness's testimony was repetitive. *Id*. at ---. Here, we cannot see how Workman's prior inconsistent statements during his deposition regarding the number of times he had been arrested could have had any impact on the jury's decision. Furthermore, Workman's testimony as to what transpired when Wilson came to Booher's house the evening of the murder was largely corroborated by the testimony of Booher herself. Further, Wilson had ample opportunity to cross-examine Workman during the trial. Thus, we find any error in this regard was harmless.

# B. Hearsay Evidence

[21] Wilson also argues that the trial court abused its discretion in prohibiting him from eliciting testimony from Lisa Davis regarding statements made by Amanda Ball and William "Tom Tom" Brown. In his offer to prove, Wilson stated that if allowed to continue questioning Davis regarding what she had heard Ball and Brown say, Davis would testify that she overheard Ball state that Brown asked her to dispose of the weapon used in this incident, that Ball did dispose of the weapon, and that Brown told Davis that both he and Wilson were involved in Jaffke's murder. Wilson conceded at trial that the statements were hearsay but argued that the evidence was nonetheless admissible as exceptions to the hearsay rule under Indiana Evidence Rule 804(b)(3) "statements against penal interest."

[22] Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is inadmissible unless it falls under a hearsay exception. Ind. Evidence Rule 801; *see also Teague v. State*, 978 N.E.2d 1183, 1187 (Ind. Ct. App. 2012). Under Indiana Evidence Rule 804, hearsay testimony may be admissible as evidence at trial as an exception to the hearsay rule. *Jackson v. State*, 735 N.E.2d 1146, 1150 (Ind. 2000). Rule 804 ("Exceptions to the Rule Against Hearsay - When the Declarant is Unavailable as a Witness") provides in relevant part as follows:

> (a) Criteria for Being Unavailable. A declarant is considered to be unavailable as a witness if the declarant:
>
> * * * * *

(5) is absent from the trial or hearing and *the statement's proponent has not been able, by process or other reasonable means*, to procure:

* * * * *

(B) the declarant's attendance or testimony, in the case of a hearsay exception under rule 804(b)(2), (3), or (4).

* * * * *

(b) Hearsay Exceptions.  The following are not excluded by the hearsay rule *if the declarant is unavailable as a witness.*

* * * * *

(3)  Statement Against Interest.  A statement that that[3] a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability.

A statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both the declarant and the accused, is not within this exception.

Ind. Evidence Rule 804 (emphases added); *see also Jervis v. State*, 679 N.E.2d 875, 878 (Ind. 1997) (in which the Indiana Supreme Court "put judicial flesh on the bones of Rule 804(b)(3)"); *James Beasley v. State*, 29 N.E.3d 802, 811 (Ind. Ct. App. 2015) ("[T]he rationale for allowing statements against interest into evidence is that the declarant would only make such a statement if it were true because the content of the statement goes against the declarant's interests . . . ."). If a statement involves hearsay within hearsay, also known as multiple

---

[3] So in original.

hearsay or double hearsay, the statement may still be admitted if each layer of hearsay qualifies under an exception to the hearsay rule. *See Teague*, 978 N.E.2d at 1187; *see also* Ind. Evidence Rule 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.").

[23] First, we find the statement that Davis heard Ball say that Brown asked her to dispose of the weapon is a clear instance of double hearsay; as such, each layer of hearsay must qualify under an exception to the hearsay rule. While there is perhaps an argument to be made that Brown's asking Ball to dispose of the weapon could be characterized as a statement against Brown's penal interest, Ball's statement that Brown asked this of her clearly would *not* qualify under this exception because it is not a statement against her penal interest. Therefore, the trial court did not abuse its discretion in prohibiting the admission of this hearsay.

[24] We agree with the trial court that the other two statements—Brown's statement that both he and Wilson were both involved in Jaffke's murder and Ball's statement that she did dispose of the weapon—were also inadmissible hearsay because Wilson failed to make the requisite showing that declarants Brown and Ball were unavailable. A declarant is unavailable for purposes of this exception if the declarant is absent from trial and the party "has not been able, by process or other reasonable means, to procure[] the declarant's attendance." *See Davis v. State*, 13 N.E.3d 939, 946 (Ind. Ct. App. 2014) (quoting Evid. R. 804), *trans.*

*denied*; *see also Garner v. State*, 777 N.E.2d 721, 724 (Ind. 2002) ("Even if there is only a remote possibility that an affirmative measure might produce the declarant at trial, the good faith *may* demand effectuation. Reasonableness is the test that limits the extent of alternatives the State must exhaust."). Wilson admitted at trial that he had not listed Brown or Ball as potential witnesses, and that he had not subpoenaed them, or made any effort whatsoever to summon them to trial to testify in person. He cannot, therefore, rely on Rule 804's "statement against interest" hearsay exception, which requires the statement's proponent to prove unavailability of the declarant. *See* Evid. R. 804.

[25] But Wilson contends that "[e]ven if the requirements of Evid[ence] R[ule] 804 were not met, the exclusion of such evidence was reversible error." Appellant's Br. p. 18. This is so, Wilson continues, because defendants have a right— rooted "directly in the Due Process Clause of the Fourteenth Amendment and the Compulsory Process and Confrontation Clauses of the Sixth Amendment[]"—to present evidence tending to show that someone else committed the charged crime, and "[i]n essence, the evidence of the statements of Ball and Brown constituted evidence [th]at a third party—Brown—had committed the offense, not Wilson." *Id*. at 19 (citing *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*). We disagree with Wilson's interpretation of the import of the excluded statements, particularly the notion that the statements in some way exonerate Wilson. Whether Ball disposed of the weapon is simply irrelevant and says nothing about Wilson's culpability. But Brown's statement that "he and [Wilson] had done it" would appear to

implicate—rather than exonerate—Wilson. And in any event, that statement was basically cumulative of testimony that *was* in fact before the jury: earlier in the cross-examination of Davis, when discussing what Davis heard at the Cossack Club, the following colloquy occurred:

> [Wilson]: My understanding is that night [Brown] was the one that's really doing most of the talking?
>
> [Davis]: Yes.
>
> [Wilson]: [Wilson]'s not saying too much?
>
> [Davis]: Right.
>
> [Wilson]: But [Brown] indicates to you that he and [Wilson] were involved in that incident, is that right?
>
> [Davis]: Yes.

Tr. p. 279-80. In light of the above, we find that the trial court did not abuse its discretion in excluding the hearsay statements and that there was no violation of Wilson's constitutional rights on these grounds.[4]

# II. Sufficiency of Evidence

Next, Wilson contends that the evidence is insufficient to support his convictions. Specifically, Wilson argues that the State "failed to prove [he] knowingly killed Jaffke or that he knowingly engaged in a Robbery during

---

[4] Even if we were to find that the trial court erred in excluding these statements and that Wilson's constitutional rights were implicated by this exclusion, we also find that after reviewing the whole record (discussed more fully in the sufficiency-of-evidence section below) that any error was harmless beyond a reasonable doubt because the State has shown that the error complained of did not contribute to the verdict obtained. *See Hall*, --- N.E.3d at ---.

which [Jaffke] was shot. The State also failed to establish Wilson was carrying a handgun that night." Appellant's Br. p. 21.

[27] Our standard of reviewing claims of sufficiency of the evidence is well settled. When reviewing the sufficiency of the evidence, we consider only the probative evidence and reasonable inferences supporting the verdict. *Boggs v. State*, 928 N.E.2d 855, 864 (Ind. Ct. App. 2010), *trans. denied*. We do not reweigh the evidence or assess witness credibility. *Id*. We consider conflicting evidence most favorably to the trial court's ruling. *Id*. We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id*. It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id*. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id*. A conviction may be based upon circumstantial evidence alone. *Id*.

[28] In order to convict Wilson of murder, a felony, the State was required to prove beyond a reasonable doubt that Wilson knowingly or intentionally killed Jaffke. Ind. Code Ann. § 35-42-1-1 (West 2012). As to Wilson's robbery conviction, at the time these offenses were committed, Indiana Code section 35-42-5-1 provided as follows:

> A person who knowingly or intentionally takes property from another person or from the presence of another person:
> (1) by using or threatening the use of force on any person; or
> (2) by putting any person in fear;
> commits robbery, . . . a Class A felony if it results in serious bodily injury to any person other than a defendant.

Ind. Code Ann. § 35-42-5-1 (West 2012).

[29] Here, the evidence shows that Jaffke left Papa John's in his black Jeep with two pizza delivery orders at 6:42 p.m. Jaffke delivered the first order before he was shot and his Jeep was stolen; approximately one-half hour after that delivery, the recipient of this order found Jaffke unresponsive in the apartment-complex parking lot. At around 6:45 p.m. that same evening, Continental Court resident Penrod had heard a male voice through her open window saying, "[O]h God, oh God no" in a "begging and desperate tone." Tr. p. 68. Penrod then heard a single gunshot and a vehicle door close. When she looked out her window, she saw the taillights of the vehicle exiting the apartment complex. Police dispatch received a 911 call saying that there was a black Jeep with a Papa John's sign on it speeding westbound on Epler Avenue crossing Bluff Road.

[30] Around 8:00 p.m., Wilson arrived at his stepmother's house and announced that he had done "somethin' real bad" – that he "just shot a man on the southside." *Id*. at 131. Wilson went on to say, "I got him with this right here" while patting his stomach or waistband area. *Id*. at 132-33, 156-57. The butt of a handgun could be seen in his waistband.[5] *Id*. at 179. At his stepmother's house, Wilson was crying and appeared "scared to death." *Id*. at 176, 167. Jaffke's black Jeep was found in the parking lot of a laundromat very near his

---

[5] In his appellate brief, Wilson admits that his stepmother testified that she saw a gun in his waistband, but argues that "the State presented no evidence indicating that the item in Wilson's waistband was an actual firearm, rather than, for instance, a toy gun." Appellant's Br. p. 25. But the trial court credited Booher's testimony on this point, and again we do not reweigh the evidence on appeal.

stepmother's house, and one of Wilson's fingerprints was found inside the Jeep. We find that the evidence shows that Wilson knowingly or intentionally killed Jaffke and thus supports Wilson's conviction for murder. *See* Ind. Code Ann. § 35-42-1-1 (West 2012). We find that the evidence also shows that Wilson took (at least) Jaffke's Jeep after using force on him and therefore supports his robbery conviction. *See* Ind. Code Ann. § 35-42-5-1 (West 2012).

[31] Finally, in order to prove that Wilson was carrying a handgun without a license as a Class A misdemeanor, the State was required to prove that Wilson carried a handgun in a vehicle or on or about his body without being licensed to do so. *See* Ind. Code Ann. § 35-47-2-1 (West 2012). Once the State demonstrates that a defendant had possession of a handgun on his body or in a vehicle, it then becomes the defendant's burden to demonstrate that he had a valid license to carry the handgun. *See Armstrong v. State*, 742 N.E.2d 972, 977 (Ind. Ct. App. 2001). Here, the evidence shows that when Wilson went to his stepmother's house the evening of the murder, he said, "I got him with this right here" while patting his stomach or waistband area. Tr. p. 132-33, 156-57. The butt of a handgun could be seen in his waistband. *Id*. at 179. Detective James Vaughn testified that Wilson did not have a valid license to carry a handgun. *See id*. at 309. Wilson made no evidentiary showing that he did have a valid license to carry a handgun. We therefore find the evidence is sufficient to support Wilson's conviction for Class A misdemeanor carrying a handgun without a license.

# III. Sentencing

Finally, Wilson contends that the trial court issued defective sentencing orders. In particular, Wilson contends that the trial court erred by failing to vacate the conviction for felony murder, which it "merged" into the murder conviction. Moreover, he argues, the trial court's oral and written sentencing orders conflict as to whether the robbery conviction was a Class A or Class C felony and there is ambiguity as to whether the "use of a firearm" was merged into or was used as a sentencing enhancement of the murder conviction.

## A. Merger of Felony-Murder Conviction

Wilson argues first that the trial court improperly merged felony murder into murder, rather than vacating felony murder, and that this resulted in a double-jeopardy violation. Our Supreme Court has addressed the issue of merger as follows:

> To be sure, a defendant's constitutional rights are violated when a court enters judgment twice for the same offense, but not when a defendant is simply found guilty of a particular count.
>
> On the other hand, a merged offense for which a defendant is found guilty, but on which there is neither a judgment nor a sentence, is "unproblematic" as far as double jeopardy is concerned. In *Laux* [*v. State,* 821 N.E.2d 816, 820 n.4 (Ind. 2005)], we disapproved those cases which "indicate[ ] that vacating a jury verdict is the appropriate remedy rather than merger and entering a judgment of conviction only on the merged count."

*Green v. State*, 856 N.E.2d 703, 704 (Ind. 2006) (internal citations and quotations omitted).

[34] Although the jury found Wilson guilty of murder and felony murder, the Abstract of Judgment and the written Sentencing Order clearly show that the trial court did not enter judgment of conviction for felony murder. *See* Appellant's App. p. 16-19 (Abstract of Judgment and Sentencing Order). Because the felony-murder count was merged, rather than reduced to judgment, and Wilson was never sentenced for felony murder, we find no double-jeopardy violation. There is, therefore, no need for the trial court to vacate the felony-murder count in this case.

## B. Conflicts in Sentencing Orders

[35] Last, Wilson argues that there is a conflict between the oral and written sentencing orders as to whether Wilson's robbery conviction was a Class A or a Class C felony, and whether the "use of a firearm" enhancement was sentenced separately or as an enhancement to the murder conviction. As to the robbery conviction, the following exchange occurred at the sentencing hearing:

> [The State]: . . . Count Two, the robbery, I think if the enhancement to an A felony is due to Mr. Jaffke's death, I think that would probably have to be dropped down to a B, robbery with a deadly handgun.
>
> [Trial court]: I'm comfortable if it's a C.
>
> [The State]: Okay. Terrific.
>
> [Trial court]: It will be a C.

Tr. p. 374. The written Sentencing Order clearly shows that the jury found Wilson guilty of robbery as a Class A felony, but the trial court sentenced him on robbery as a lesser-included Class C felony. Indeed this information appears in two different sections of the Sentencing Order: first in the "confinement

comments" and then again in the "additional sentencing information" box at the end of the order. *See* Appellant's App. p. 18-19 (Sentencing Order). Therefore, we find no issue as to the robbery count.

[36] Wilson also contends that there is ambiguity as to whether the "use of a firearm" was merged into or was an enhancement to the murder conviction. And the State acknowledges that "it appears that there is a scrivener's error on the top of the sentencing order" because in "Part I, Charges" on the Order, the Disposition column corresponding to "Count IV, USE OF A FIREARM/SE" reads "Conviction Merged." *See* Appellee's Br. p. 28; Appellant's App. p. 18. But in Part II of the order, the "Confinement Comments" column next to Count I, murder, reads as follows: "55 years + 5 years use of fire arm enhancement." Appellant's App. p. 18. And in Part IV of the same order, under "Additional Sentencing Information," the following information appears: "[C]ount I: 55 enhanced by 5 years department of correction by sentencing enhancement use of a firearm[.]" *Id*. at 19.

[37] The Abstract of Judgment clearly reads that Wilson is sentenced to sixty years on Count I, murder; in a separate section of Part II, below the three listed counts on which Wilson was sentenced, is a box that reads "Firearm used in commission of offense sentencing enhancement. Sentence: 5 Years." *Id*. at 16. And in the box for "Additional Comments and Recommendations" (see below) the following comments appear: "[C]ount 1: 55 enhanced by 5 years department of correction by sentencing enhancement use of a firearm" and "55

years + 5 years use of fire arm enhancement." *Id.* at 17.  Thus, it seems clear that the use of a firearm was an enhancement.

[38]     Affirmed.


May, J., and Mathias, J., concur.