# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 21 2018, 9:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael R. Fisher
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Darrin Shores,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 21, 2018

Court of Appeals Case No.
18A-CR-81

Appeal from Marion Superior Court

The Honorable Sheila A. Carlisle, Judge

Trial Court Cause No.
49G03-1704-MR-15432

**Bradford, Judge.**

# Case Summary

[1] In 2008, Thomas Johnson was shot and killed in Indianapolis. The case remained unsolved until 2016, when detectives received a tip from an individual in federal custody that Ashley Jones was a witness to the murder. After interviewing Jones, Darrin Shores was charged with Johnson's murder.

[2] A trial was held in December of 2017. At trial, Shores attempted to ask one of the detectives about the criminal history of individual who provided the tip, any benefit he may have received for providing the tip, and federal sentencing for drug offenses. The State objected on several grounds including lack of personal knowledge. After a bench conference, the objections were sustained. Shores was found guilty as charged.

[3] On appeal, Shores argues that the trial court committed reversible error in sustaining two objections to Shores's questioning of the detective about the criminal history of the individual who provided the tip and federal sentencing for drug offenses. Because the trial court did not abuse its discretion in finding that the detective lacked sufficient personal knowledge to testify about the matter, we affirm.

# Facts and Procedural History

[4] In 2008, Johnson purchased drugs from Shores on multiple occasions. (State's Ex. 86-87). In exchange for the drugs, Johnson allowed Shores to borrow his

Toyota Highlander. Jones, Shores's then-girlfriend, witnessed some of these exchanges. (Tr. Vol. II 204-05).

[5] On the morning of November 24 or November 25, 2008, Johnson went to the Rosewood Commons apartment complex in Indianapolis, Indiana, where Shores was residing at the time, to retrieve his vehicle. (Tr Vo. II 132-33; Tr. Vol. III 131). Johnson's vehicle was not at the apartment complex at that time, so he left. (Tr. Vol. II 132-33).

[6] In the early morning hours of November 27, 2008, Johnson called Shores's mobile telephone fifteen times starting at 4:34 a.m. (Tr. Vol. II 210-11, 213, 227, 240-41). At some point, Shores answered and he and Johnson proceeded to have a heated discussion. Johnson told Shores that he was "coming to get his truck back and that he wanted his money back" "because the drugs [Shores gave him] was no good." Tr. Vol. II 210, 227. Johnson also said he was coming over to kill Shores. Tr. Vol. II 212.

[7] Johnson placed two final calls to Shores at 6:04 a.m. and 6:23 a.m., both of which went to voicemail. (Tr. Vol. III p. 129, 132, 145-47). Johnson went to Shores's apartment complex again and looked inside Shores's bedroom window. (Tr. Vol. II 213-14). When Shores and Jones saw him in the window, Shores got dressed, grabbed his gun, and walked out the front door. Jones heard a gunshot go off very close to the bedroom window. (Tr. Vol. II 217-18). After the gunshot, Shores returned to the apartment and said, "Got his a**." Tr. Vol. II 219.

[8]　At 6:48 a.m., officers were dispatched to Rosewood Commons after someone called to report that there was a "perpetual horn blowing" and a vehicle in a bush. Tr. Vol. II 107. Officer Jeff Mehrlich responded to Rosewood Commons and found Johnson's vehicle stopped against a guardrail near the exit of the apartment complex. (Tr. Vol. II 86, 92). When Officer Mehrlich approached the vehicle, he observed Johnson gasping for air with an injury to his chest in the driver's seat. (Tr. Vol. II 86). Johnson later died from the gunshot wound. (Tr. Vol. III 54, 57).

[9]　Detective Michael Mitchell was assigned to the case and obtained mobile telephone records for the telephone found in Johnson's vehicle. (Tr. Vol. II 115, 117) Detective Mitchell investigated the case, but was unable to develop any leads, causing the investigation to go cold. (Tr. Vol. II 108-10, 112). Jones never went to the police with the information she had because she was scared to be involved with a homicide. (Tr. Vol. II 224). She continued her relationship with Shores for some time and had a child with him in 2010. The case was eventually reassigned to Detective David Ellison of the Cold Case Unit. (Tr. Vol. II 113).

[10]　Several years later, in 2016, Jones told her then-boyfriend and father of one of her children, Daemez Long, about the events surrounding Johnson's death. (Tr. Vol. 228-29). In June of 2016, Jones was driving with Long, when the two were stopped by federal agents and Long was arrested for having 23 ounces of heroin in the vehicle. (Tr. Vol. III 2, 4). Long was taken into custody on federal charges. When Long was in custody, he told officers that he had

information on an unsolved murder and provided Jones's name as a witness to that murder. (Tr. Vol. II 190-191).

[11] Jones was interviewed by Detective Ellison on several occasions and told him what she had witnessed in November of 2008. (Tr. Vo. II 191-93, 224, 229-30). She also took the Detective to the scene of the murder and was able to identify Johnson as the victim and Shores as the shooter from photo arrays. (Tr. Vol. II 225-26, 231-32; Tr. Vol. III 78-82). Jones's account of the telephone calls that occurred that night between her and Shores and between Johnson and Shores was corroborated by mobile telephone records. (Tr. Vol. II 230-31; Tr. Vol. III 147-49).

[12] Detective Ellison found and interviewed Shores in Georgia. (Tr. Vol. III 208-10). During the interview, Shores claimed he was living with his mother at the time of the homicide, denied any connection to his mobile telephone number, denied recognizing Johnson when shown a picture of him, and denied knowing about Rosewood Commons. (Tr. Vol. III 214-17). On April 26, 2017, Shores was charged with murder. (App. Vol. II pp. 7, 9).

[13] Shores's jury trial was held from December 4 to December 5, 2017. When Detective Ellison testified about Long's part in the investigation, he confirmed that Long had "some incentive for giving" the information about Jones and her knowledge of the homicide. Tr. Vol. II 188-89. He further explained that Long was not a witness to the homicide and merely led the authorities to Jones. (Tr. Vol. II 191, 194, 196). Detective Ellison testified that he did not know what

Long was actually charged with and had not seen or talked to Long since before he was sentenced. (Tr Vol. III 219-20).

[14] When Shores attempted to ask Detective Ellison about whether Long had a criminal history, the State objected on the grounds that the witness lacked personal knowledge and the questions were irrelevant. (Tr. Vol. III 220-223). The trial court sustained the objection. Shores then asked Detective Ellison whether he had familiarity with the federal system and drug cases, to which Detective Ellison responded, "a little." Tr. Vol. III 224. Shores continued to question Detective Ellison about sentencing in the federal system and the State objected on the grounds of speculation and that Long was not a witness. (Tr. Vol. III 224). The trial court sustained this objection as well. The jury found Shores guilty as charged, and the trial court sentenced Shores to fifty-five years.

# Discussion and Decision

[15] Shores argues that the trial court committed reversible error when it denied him his Sixth Amendment right to cross-examine a witness. As a general matter, the decision to admit or exclude evidence lies within the trial court's sound discretion and is afforded great deference on appeal. *Carpenter v. State*, 786 N.E.2d 696, 703 (Ind. 2003). We will not reverse the trial court's decision on appeal "unless it represents a manifest abuse of discretion that results in the denial of a fair trial." *Id.* While conducting our review, we will not reweigh the evidence and will consider any conflicting evidence in favor of the trial court's ruling. *King v. State*, 985 N.E.2d 755, 757 (Ind. Ct. App. 2013).

[16] "Both the Federal Constitution and our Indiana Constitution guarantee a defendant's right to confront the witnesses against him. U.S. Const. amend. VI; Ind. Const. art. 1, § 13. This right is not absolute; it is subject to reasonable limitations, which we trust our trial judges to impose." *Pierce v. State*, 29 N.E.3d 1258, 1268 (Ind. 2015). The trial court may, within reason, impose limitations on the right to cross-examine based on their "concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Wilson v. State*, 39 N.E.3d 705, 712 (Ind. Ct. App. 2015). However, that exercise of discretion must be consistent with due process. *Id*; *see also McCarthy v. State*, 749 N.E.2d 528, 533–36 (Ind. 2001) (finding error, although not reversible, in denying defendant the opportunity to cross-examine a witness about an event that may have motivated her to favor the prosecution). To aid the trial court and reviewing appellate court in determining the appropriate scope of cross-examination, a party will often present an offer of proof. *Id*. at 1268. "Absent an offer of proof, neither this court nor the trial court can adequately determine the admissibility and relevance of the proffered testimony." *Paullus v. Yarnelle*, 633 N.E.2d 304, 308 (Ind. Ct. App. 1994).

[17] Shores claims the trial court abused its discretion by not permitting him to cross-examine Detective Ellison to establish that Long could have received a longer sentence had he not provided Jones's name and that Jones received a significant benefit by testifying through the early release of Long. The State objected on the grounds that it was irrelevant, the questions were attempting to

impeach an individual who was not a witness, and the witness lacked personal knowledge. (Tr. Vol. III p. 221-22).

[18]     Under Indiana Rules of Evidence 602 and 701, a witness must have personal knowledge of a matter in order to testify about it.

Evidence Rule 602 provides:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. A witness does not have personal knowledge as to a matter recalled or remembered, if the recall or remembrance occurs only during or after hypnosis. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness.

Evidence Rule 701 states:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to the clear understanding of the witness's testimony or the determination of a fact in issue.

[19]     The trial court did not abuse its discretion in determining that Detective Ellison lacked personal knowledge to testify regarding any deal Long might have made in his federal case. Detective Ellison said he did not know what Long was originally charged with, convicted of, or ultimately sentenced to. (Tr. Vol. III p. 219, 220). Detective Ellison also testified that he had not spoken to or seen Long since before his sentencing hearing. Moreover, to the extent that

Detective Ellison was aware of any deal or leniency that Long may have received, no offer of proof was made to that effect. Given the evidence of Detective Ellison's lack of knowledge regarding Long's criminal case and the federal system as a whole, all indications are that any answer he would have given to Shores's questions would have been speculative. Shores has failed to establish an abuse of discretion in this regard.

[20] We think it is worth noting that Shores was not precluded from impeaching Jones through cross-examination about Long, his charges, his sentence, her relationship with him, or any reason why a deal Long received might provide her with a motive to lie.[1] As it happened, the only question Shores asked of Jones with respect to Long's federal charges, which the trial court permitted over the State's objection, was whether she was driving the vehicle when Long was arrested by federal agents for drugs. The trial court properly denied the two questions that Shores posed to Detective Ellison.

[21] The judgment of the trial court is affirmed.

Baker, J., and Kirsch, J., concur.

---

[1] Shores asked Jones, "What do you know about the charges that [Long] faced with the feds?" and "[W]ere you driving the vehicle when [Long] got arrested?" Tr. Vol. III 2–4. The State objected to the first question. During a bench conference, Shores merely said he was trying to establish Jones's own personal motive because she was driving the car when Long was arrested. Shores did not try to elicit any other information about Jones's knowledge of the Long's charges or sentence or whether she was still in a relationship with Long at the time of the trial.