## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 19 2020, 8:39 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald R. Shuler
Barkes, Kolbus, Rife & Shuler, LLP
Goshen, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Tiffany A. McCoy
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Benford Davis, *Appellant-Defendant,* | June 19, 2020 |
| v. | Court of Appeals Case No. 19A-CR-2357 |
| | Appeal from the Elkhart Circuit Court |
| State of Indiana, *Appellee-Plaintiff* | The Honorable Michael A. Christofeno, Judge |
| | Trial Court Cause No. 20C01-1902-MR-1 |

**Crone, Judge.**

## Case Summary

[1] A jury found Benford Davis guilty of murdering Sherry Houston. On appeal, Davis argues that the trial court committed reversible error in admitting certain evidence, including testimony from Sherry's friend and a letter that Sherry wrote to her sister. We disagree and therefore affirm.

## Facts and Procedural History

[2] Sherry and her husband Fred lived on the ground floor of a two-story rental home in Elkhart. Sherry's friend Angela Coleman lived on the second floor. In the fall of 2017, Fred moved out of the home, and Sherry began a romantic relationship with Davis. According to Sherry's friend and neighbor Johnna Bloss, Sherry was initially "very happy and excited" about the relationship, but by November she had become "aggravated" and "confused." Tr. Vol. 2 at 150, 151. Bloss saw Davis at Sherry's home "[d]aily" at "[a]ll times of the day and night." *Id.* at 152. She also heard Sherry talking to Davis on the phone "numerous times a day." *Id.* During those conversations, Davis would accuse Sherry of having sex "with guys and girls[,]" call her demeaning names, and tell her "she better not be with anybody, or he was gonna hurt her[.]" *Id.* at 153.

[3] By Christmastime, Sherry "started to get very depressed and withdrawn, and she wouldn't talk to a lot of people. She … would stay inside." *Id.* at 157. Sherry and Bloss added a couple locks to Sherry's front and back doors because Sherry "was scared." *Id.* at 162. Via letters and phone calls, Sherry told her incarcerated sister, Doris Quinn, that "she was scared of [Davis]." *Id.* at 201.

Sherry also told Quinn that "[s]he felt like committing suicide" because "[s]he felt that she didn't have anyone there to protect her." *Id*. at 204.

[4] Around February 2018, Sherry's bedroom window was broken. She called the police and her landlord, Daniel Schott. Sherry told Schott that Davis "broke her window and looked … inside the bedroom." Tr. Vol. 3 at 7. According to Schott, Sherry was "upset" and "afraid." *Id*. at 6. Schott boarded up and eventually replaced the window.

[5] After the break-in, Sherry bought a handgun to replace one that had been stolen previously. Coleman, who was with Sherry when she bought the handgun, attributed the purchase to Sherry "being scared." Tr. Vol. 2 at 229. By that time, Sherry's relationship with Davis had gotten "pretty bad[,]" *id*., and both Bloss and Coleman would call Sherry to warn her when they saw Davis near her home. Sherry asked Bloss to help her get a protective order. According to Quinn, Davis "talked [Sherry] out of getting one." *Id*. at 215.

[6] On Saturday, March 24, 2018, Quinn called Sherry. Davis was at Sherry's home, and he made her give him the phone after she answered Quinn's call. Quinn called back later that day, and Sherry was alone. Sherry told Quinn that Davis "said he wished [Sherry] was dead." *Id*. at 214. On Sunday, March 25, Sherry ran some errands with neighbor Harry Snyder. Snyder noticed that Sherry "was getting really perturbed" because her "phone kept ringing off the hook, and she said, 'I'm not answering it no more.'" *Id*. at 136. Sherry and Snyder had a cookout at his house, and she went home around 7:00 p.m. Later

that evening, Fred called Sherry and told her "good night." *Id.* at 116. Around 11:30 p.m., Coleman heard Sherry's "door close" and "[d]idn't think nothing of it[.]" *Id.* at 232.

[7] Around 11:00 a.m. on Sunday, March 26, Bloss saw "Davis down the alley" near Sherry's home. *Id.* at 171. Davis saw Bloss and "turned to walk the other way …." *Id.* at 172. Bloss "went over to knock on [Sherry's] door to tell her [Davis] was there again." *Id.* at 171. Bloss noticed that "[t]he radio was on very loud." *Id.* Sherry did not answer the door. Bloss returned at 12:30 p.m. and 4:30 p.m., and Sherry still did not answer the door. Bloss tried to call her and got no answer.

[8] That same day, Fred tried to call Sherry "several times" and "got a little worried" because she did not answer the phone or call him back. *Id.* at 116. Fred called Snyder and told him that Sherry was not answering her phone. Snyder knocked on Sherry's door and got no answer. He heard music playing and thought that "something's not right there because [Sherry was] always looking for [him]." *Id.* at 133. Snyder informed Fred, who called Schott. Schott knocked on Sherry's front and back doors, and no one answered. Around 7:20 p.m., Schott flagged down a passing policeman and asked him to investigate. The front and back doors were locked, but the side door, which was usually secured with a "safety stick, wasn't locked, and [the stick] was gone." Tr. Vol. 3 at 9.

[9] Schott opened the side door and saw Sherry lying on the living room floor. "[T]here was a radio on that was loud." Tr. Vol. 2 at 77. The police officer saw that Sherry was not breathing. He began to perform CPR but stopped when he noticed that she was "stiff and cold to the touch …." *Id*. at 80. He observed "scratches and some discoloration on the left side of [Sherry's] neck." *Id*. at 90. A coffee table and other items had been knocked over, and a battery had been removed from a cordless phone. A half-eaten meal and an ashtray with three cigarette butts were on the kitchen table. Two empty handgun boxes were found, but no handguns were recovered from the home.

[10] On Tuesday, March 27, Dr. Amanda Fisher-Hubbard performed an autopsy on Sherry. Sherry had multiple rib fractures, bite-mark injuries on her tongue, visible injuries to her nose, arms, hands, and fingers, and extensive injuries to her neck, including bruising, abrasions, fractured thyroid cartilage, and a fractured hyoid bone. Dr. Fisher-Hubbard determined that the injuries occurred around the time of death, which was caused by asphyxia due to strangulation, and that the manner of death was homicide.

[11] Police learned about Davis's relationship with Sherry and unsuccessfully tried to locate him. On Wednesday, March 28, they obtained a search warrant to track his cell phone location and access his phone records. They determined that Davis had traveled from Elkhart to South Bend, where he bought a bus ticket to Indianapolis at 7:27 p.m. on March 26.

On Thursday, March 29, officers went to Indianapolis and interviewed Davis, who acknowledged his relationship with Sherry but claimed that he had not seen her since the previous Wednesday or Thursday. He also claimed that he did not call or text Sherry between March 23 and 25. But Davis's and Sherry's phone records indicated that they had contacted each other every day, for a total of approximately 550 times, between March 1 and March 25. On March 25, they contacted each other thirty-four times, with the last being a two-minute call from Davis, who was in Elkhart, at 7:38 p.m. After that call, no more contacts or attempted contacts were made between their phones, and calls for Sherry were forwarded to voicemail.

During the interview, the officers asked Davis to provide a buccal swab for DNA analysis. Davis refused, and the officers obtained a warrant for the swab. Lab testing detected Davis's DNA on two of the cigarette butts found in Sherry's ashtray and on her cordless phone, as well as on the neck area of the coat and the sweatshirt that she was wearing when she was killed. Davis's DNA was also detected under Sherry's fingernails and on vaginal and anal swabs taken from her body.

In February 2019, the State charged Davis with murder. A four-day jury trial was held in August 2019. Over Davis's objection, Bloss testified that in February 2018 Sherry called her and said that "Davis had just broke through her window while she was asleep, and she was scared to be alone." *Id*. at 164. Bloss also testified that Sherry called her three weeks later, "sobbing" and "scared." *Id*. at 168. Bloss went over to Sherry's home and saw that "her face

was very red and very swollen" and her neck "had marks from where she had been choked." *Id*. at 169. Over Davis's objection, Bloss testified that Sherry told her that Davis "came to her house. She opened the door. She told him to leave; he wouldn't leave. And he choked her, tried to strangle her." *Id*. at 169-70.

Davis also objected to the admission of a letter that Sherry wrote to Quinn in January 2018 and to Quinn's reading of the following portion of that letter:

> About Mercy [the sisters' nickname for Davis], damn. I don't know where to start. It's so much. That man is so in love, he scare me. Like, if I don't kill him, he might kill me. I'm praying to God to remove him. I'd rather see him locked up. I told him I was done with him, and he found a way to Indianapolis. Girl, and he called me, and he acting like he's about to lose his mind. I don't want nothing to happen to him, but I don't want him back here, but I can feel he's coming back. Damn, that man threaten me like no other before he left. I got to save some for the Lord because it's too much.
>
> But, other than, how about yourself? This one time, I wish I could help you do your time. I would to get away from him 'cause I have to watch my back at all times and keep my gun on me. He's crazy in love. I think them damn Lifetime movies done grew on my ass. LOL. I think he thinks so much of you and care about what you think, it stops him sometimes from really acting all the way out. But I told him it would be a murder-suicide before I get to -- before I get to prison from hurting him because he ain't giving-- he -- because he ain't going to mess -- mess with me out here and take my freedom too.… That's enough about him. Love, your sis.

*Id.* at 207-08; State's Ex. 101.[1]

The jury found Davis guilty as charged, and the trial court sentenced him to sixty-five years. Davis now appeals.

## Discussion and Decision

Davis contends that the trial court committed reversible error in admitting Bloss's two statements and Sherry's letter to Quinn. A trial court has broad discretion in admitting or excluding evidence. *Wilson v. State*, 39 N.E.3d 705, 712 (Ind. Ct. App. 2015), *trans. denied*. "We therefore disturb its ruling only if it amounts to an abuse of discretion, meaning the court's decision is clearly against the logic and effect of the facts and circumstances or it is a misinterpretation of the law." *Id.* Even if the trial court's ruling was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Id.* "An error will be found harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." *Id.* We may affirm the trial court's ruling if it

---

[1] The bases for Davis's objections to Bloss's first statement and to Sherry's letter, as well as the ensuing bench conferences, were not recorded and therefore were not transcribed by the court reporter. Tr. Vol. 2 at 163, 207. Other objections and bench conferences also were not recorded. During and at the close of trial, the court briefly summarized the objections and rulings for the record. We appreciate the court's conscientious efforts, and we recognize that many courtrooms are not ideally designed or equipped for preserving the record outside the jurors' earshot. But we respectfully observe that a verbatim transcript is the best means of allowing us to review what are often complicated and nuanced legal issues and to determine whether a party has preserved or waived a claim of error.

is sustainable on any legal basis in the record, even though it was not the reason given by the trial court. *Id.*

[18] With respect to Bloss's statement that Sherry told her that Davis broke her bedroom window, we note that Schott made a similar statement without objection. *See* Tr. Vol. 3 at 7 ("[Sherry] said Mr. -- Mr. Davis broke -- broke her window and looked inside the -- inside the bedroom."). "It is well settled that any error in admission of evidence is harmless if the same or similar evidence has been admitted without objection." *Lowery v. State*, 478 N.E.2d 1214, 1228 (Ind. 1985), *cert. denied* (1986). Accordingly, we find no basis for reversal here.[2]

[19] As for Bloss's statement that Sherry told her that Davis choked and tried to strangle her, Davis contends that it should have been excluded pursuant to Indiana Evidence Rules 404(b) and 403. Evidence Rule 404(b)(1) states, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Evidence Rule 404(b)(2) provides in pertinent part, "This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 404(b) "is designed to prevent the jury from

---

[2] Before Davis objected to Bloss's statement, Bloss testified without objection that Sherry told her that "she was asleep in her bed, and um, somebody came through her window." Tr. Vol. 2 at 162. On appeal, Davis suggests that Bloss's testimony differs significantly from that of Schott, who testified that Davis broke the window and "looked inside" the bedroom. Tr. Vol. 3 at 7. We find this to be a distinction without a meaningful difference.

assessing a defendant's present guilt on the basis of his past propensities, the so called 'forbidden inference.'" *Hicks v. State*, 690 N.E.2d 215, 218-19 (Ind. 1997). In assessing the admissibility of evidence regarding a crime, wrong, or other act, the court must determine that the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act and then must balance the probative value of the evidence against its prejudicial effect pursuant to Evidence Rule 403. *Id.* at 221.

[20] Evidence Rule 403 states, "The court may exclude relevant evidence[3] if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." The inquiry is not whether the evidence is prejudicial, since all relevant evidence is inherently prejudicial in a criminal case; rather, the inquiry is whether the evidence is *unfairly* prejudicial. *Cadiz v. State*, 683 N.E.2d 597, 600 (Ind. Ct. App. 1997). "When determining the likely unfair prejudicial impact, courts will look for the dangers that the jury will substantially overestimate the value of the evidence or that the evidence will arouse or inflame the passions or sympathies of the jury." *Fuentes v. State*, 10 N.E.3d 68, 73 (Ind. Ct. App. 2014), *trans. denied.* "A trial court's evidentiary rulings are presumptively correct, and the 'defendant bears

---

[3] "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Ind. Evidence Rule 401. Relevant evidence is admissible unless a constitution, statute, or rule provides otherwise, and irrelevant evidence is inadmissible. Ind. Evidence Rule 402.

the burden on appeal of persuading us that the court erred in weighing [unfair] prejudice and probative value under Evid. R. 403.'" *Rivera v. State*, 132 N.E.3d 5, 12 (Ind. Ct. App. 2019) (quoting *Anderson v. State*, 681 N.E.2d 703, 706 (Ind. 1997)), *trans. denied* (2020).

[21]   Davis concedes that the State offered Bloss's statement regarding the choking incident for a purpose other than to prove his character, i.e., to show the controlling and hostile nature of his relationship with Sherry and his motive for murdering her.  He also concedes that such evidence was relevant and probative.  *See Iqbal v. State*, 805 N.E.2d 401, 408 (Ind. Ct. App. 2004) ("Numerous cases have held that where a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assaults and confrontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime.").  But he asserts that the statement's probative value was substantially outweighed by the danger of unfair prejudice, in that "there was already significant other evidence of their relationship, including testimony from several witnesses, including [Fred, Quinn, Coleman, and Bloss,] as well as cell phone records that indicated the frequency of contact in their relationship."  Appellant's Br. at 16.  Davis argues that Bloss's statement

> permitted the jury to make the inference that since [he] allegedly choked and tried to strangle Sherry in late February[/]early March 2018, he must have also done it when Sherry was killed. This is exactly the type of inference that Rule 404(b) is intended to prevent, and thus its admission was highly prejudicial and improper.  There was a high likelihood that the jury would

overestimate the value of this evidence, considering the allegation of strangling and Sherry's later homicide via strangulation; further, the evidence would likely arouse the sympathies of the jury toward Sherry, thereby impacting their analysis and weighing of the evidence.

Appellant's Br. at 17.[4]

[22] Contrary to Davis's suggestion, the probative value of Bloss's statement was high, given that the identity of Sherry's murderer was the primary issue at trial. *See Spencer v. State*, 703 N.E.2d 1053, 1056 (Ind. 1999) (finding no abuse of discretion in admission of evidence regarding defendant's three prior batteries against strangled girlfriend: "Evidence of prior bad acts speaking to the identity of the killer is highly probative, as in this case where the identity of the killer was the main item of contention.").[5] And the danger of unfair prejudice was significantly lessened by the overwhelming circumstantial evidence of Davis's guilt, including his expressions of jealousy and threats to hurt Sherry; Sherry's statement to her sister that he said he wished she was dead; the DNA evidence linking him to Sherry's home and corpse and the clothing she was wearing

---

[4] We note that either party could have requested, or the trial court could have given sua sponte, a limiting instruction regarding the proper purposes for which Bloss's statement could be considered. *See State v. Velasquez*, 944 N.E.2d 34, 38-39 (Ind. Ct. App. 2011) (discussing interplay between Evidence Rules 404(b) and 105, which at that time stated, "When evidence which is admissible … for one purpose but not admissible … for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and admonish the jury accordingly."), *trans. dismissed* (2012). "When limiting instructions are given that certain evidence be considered for only a particular purpose, the law will presume that the jury will follow the court's admonitions." *Hernandez v. State*, 785 N.E.2d 294, 303 (Ind. Ct. App. 2003), *trans. denied*.

[5] Despite finding no abuse of discretion, the *Spencer* court was "inclined" to think that the evidence "should not have been admitted" because the batteries occurred two or more years before the murder. 703 N.E.2d at 1056. Here, Davis attempted to strangle Sherry just a few weeks before her murder.

when she was killed; the phone records documenting that he lied about not contacting Sherry between March 23 and 25 and that he stopped contacting her altogether after March 25; and his trip from Elkhart to Indianapolis on the day that her body was found. *See Brown v. State*, 563 N.E.2d 103, 107 (Ind. 1990) ("Evidence of flight may be considered as circumstantial evidence of consciousness of guilt."); *see also Hatcher v. State*, 735 N.E.2d 1155, 1160 (Ind. 2000) (rejecting defendant's claim that probative value of protective order that murder victim had obtained against him was substantially outweighed by danger of unfair prejudice, in part because "[t]he State presented other evidence that was far more damaging to [him]"). We conclude that Davis has failed to satisfy his burden of persuading us that the trial court erred in weighing unfair prejudice and probative value under Evidence Rule 403. In other words, the trial court did not abuse its discretion in admitting Bloss's statement.

[23] Finally, as for Sherry's letter to her sister, which the State offered into evidence for similar reasons, Davis does not specify which statements he finds objectionable. Instead, he merely complains that the letter was needlessly cumulative of other evidence regarding his relationship with Sherry. There is no indication that Davis objected to Sherry's letter on this basis at trial, and therefore this argument is waived. *See Hunter v. State*, 72 N.E.3d 928, 932 (Ind. Ct. App. 2017) ("Any grounds for objections not raised at trial are not available on appeal, and a party may not add to or change his grounds in the reviewing court."), *trans. denied*. And even assuming for argument's sake that the letter was needlessly cumulative, any error in its admission was harmless in light of

the overwhelming evidence of Davis's guilt.  Therefore, we affirm his murder conviction.

[24]    Affirmed.

Bailey, J., and Altice, J., concur.