## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 29 2017, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Scott H. Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ricardo Ortiz,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

March 29, 2017

Court of Appeals Case No.
20A03-1606-CR-1458

Appeal from the Elkhart Circuit Court

The Honorable Terry C. Shewmaker, Judge

Trial Court Cause No.
20C01-0712-FA-69

**Vaidik, Chief Judge.**

# Case Summary

[1] Ricardo Ortiz appeals his convictions for possession of cocaine and marijuana. He challenges the validity of the search warrant that led to the discovery of the drugs and, in the alternative, the sufficiency of the evidence that he was in possession of the drugs. We affirm.

# Facts and Procedural History

[2] On December 5, 2007, a "cooperating source" (CS) told an undercover officer with the Elkhart County Interdiction and Covert Enforcement (ICE) Unit that they could buy cocaine from Rafael Dejesus (who was known to the CS as "Pa Ping"). The undercover officer and the CS went to Dejesus' house in Goshen and conducted a controlled buy of 4.4 grams of cocaine.

[3] Five days later, on December 10, 2007, the undercover officer had the CS call Dejesus and say that the undercover officer wanted to buy cocaine. Dejesus told them to come back to his house, where he explained to the CS that he did not have any cocaine but that they could "follow him to his guy's house where he can pick up the quarter ounce." Appellant's App. Vol. II p. 140. The undercover officer and the CS followed Dejesus to a neighborhood in Elkhart and parked behind him. Dejesus pointed to the house he was going to, and the CS gave him cash for the buy. The undercover officer then watched as Dejesus walked toward the house he had pointed to. A few minutes later, the undercover officer saw Dejesus returning from the area of the house. The

undercover officer watched as Dejesus handed a bag of cocaine to the CS, who then handed it to the undercover officer.

[4] On December 13, 2007, the undercover officer had the CS call Dejesus again and tell him that they wanted to buy more cocaine. Dejesus "advised that he did not have any cocaine but was going to the same house as last time to pick up." *Id*. The undercover officer and the CS met Dejesus at the same location and gave him $260 in previously photocopied ICE Unit cash. The undercover officer watched as Dejesus, who was wearing a red jacket and blue jeans, walked toward the same house and approached a sliding glass door. Another officer was nearby conducting surveillance and saw a man wearing a red jacket and blue jeans walk to the sliding door and knock, a person inside the house look through the blinds, the man enter the garage of the house through a side access door, and the same man exit the same door a few minutes later and begin walking back to where the undercover officer was parked. *Id*. at 141. The undercover officer also saw Dejesus walking back from the area of the house. Dejesus handed a bag of cocaine to the CS, who immediately handed it to the undercover officer.

[5] Later that same night, the undercover officer filed an Affidavit for Search Warrant seeking authorization to search the house Dejesus went to during the second and third meetings. The affidavit recounted all of the events described above and stated the undercover officer's belief that Dejesus "obtains powder cocaine" from the house. *Id*. at 139-41. Still the same night, a magistrate

issued the warrant, and the undercover officer and others went to the house to conduct a search at approximately 10:25 p.m.

[6] At the house, officers knocked on the door but received no response. They then forced their way in and found Ortiz and a woman in the master bedroom. In the top drawer of a dresser in the master bedroom, officers found a set of digital scales inside a CD case, two small plastic baggies, and five documents bearing the name "Ricardo Ortiz," "Ricardo Ortiz Cotto," or "Ricardo O Cotto," all but one of which included the address of the house. In the bottom drawer, officers found a plastic bag containing approximately fourteen grams of cocaine. The officers also found a pair of men's pants on the floor, another pair hanging in the master bedroom closet, and $735 in a box in the same closet. $100 of the $735 was buy money the undercover officer had given Dejesus earlier that day. In the master bathroom, accessible only through the master bedroom, officers found two plastic bags containing a total of approximately forty-two grams of marijuana in the pocket of a robe, as well as an open box of plastic sandwich bags. Another box of sandwich bags was found in a gap at the top of the stairs leading to the basement.

[7] The week after the search, the State charged Ortiz with possession of three grams or more of cocaine with intent to deliver, a Class A felony, and possession of more than thirty grams of marijuana, a Class D felony. In October 2008, Ortiz moved to suppress all evidence obtained as a result of the search, challenging the magistrate's decision to issue the warrant. After a short hearing and written briefing by the parties, the trial court denied Ortiz's motion,

finding that the undercover officer's affidavit provided a "substantial basis" for issuing the warrant. *Id*. at 110.

[8] The following day, the court held a status conference and set a trial date of August 3, 2009. Ortiz was present and acknowledged that date, but he did not appear for trial, and he was tried in absentia. Over the renewed objection of Ortiz's attorney, the State was allowed to present the drugs and other evidence found during the search. The jury found Ortiz guilty as charged, and the court issued a warrant for his arrest. Ortiz was finally arrested in early 2016, and the court sentenced him to serve twenty-eight years in prison.

[9] Ortiz now appeals.

# Discussion and Decision

[10] Ortiz raises two issues on appeal. First, he argues that the undercover officer's affidavit was insufficient to support the issuance of a search warrant, that the magistrate therefore erred by issuing the warrant, and that the trial court therefore should not have allowed the State to rely on the evidence found during the search. In the alternative, he contends that the State's evidence is insufficient to prove that he possessed the drugs.

# I. Search Warrant

[11] Pursuant to the United States Constitution, the Indiana Constitution, and Indiana Code section 35-33-5-1, a court can issue a warrant only "upon probable cause." In the search-warrant context, this requires the judge or

magistrate "to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Jaggers v. State*, 687 N.E.2d 180, 181 (Ind. 1997) (formatting altered). When a defendant later challenges the issuance of a search warrant, the reviewing court (first the trial court, then the appellate court if there is an appeal) must give significant deference to the judge's or magistrate's determination and decide only whether there was a "substantial basis" for concluding that probable cause existed, that is, whether reasonable inferences drawn from the totality of the evidence support that conclusion. *Id.* at 181-82.

[12]     Ortiz's argument is that (1) the undercover officer's belief (and the magistrate's conclusion) that there was probably cocaine in the house was based on Dejesus' representations that he was obtaining cocaine from the house and (2) the affidavit did not establish Dejesus' reliability. Ortiz maintains that it is "reasonable to think that [Dejesus] had drugs on his person the entire time." Appellant's Br. p. 15. The implication, of course, is that Dejesus was simply trying to mislead the undercover officer and the CS and/or frame the occupants of the house. There are several flaws in Ortiz's theory.

[13]     First, the undercover officer's belief that there was cocaine in the house was not based solely on Dejesus' representations. On December 10, the undercover officer personally observed Dejesus point to the house, walk toward the house, and return with a bag of cocaine. On December 13, the undercover officer again personally observed Dejesus approach the house and return with a bag of

cocaine.  On the latter occasion, another officer conducting surveillance personally observed a man matching Dejesus' description knock on the door of the house, enter the garage, emerge from the garage a few minutes later, and walk back toward the undercover officer (Ortiz does not challenge the other officer's reliability).  These facts strongly corroborate Dejesus' representations regarding the origin of the cocaine.

[14] Second, the controlled buy at Dejesus' house on December 5 demonstrates that Dejesus would provide cocaine directly when he had it.  In other words, as the State puts it, Dejesus "had no reason to drive to another city on two occasions to purportedly obtain cocaine if he actually had cocaine to sell to [the undercover officer]."  Appellee's Br. p. 22.

[15] Third, we see no reason why Dejesus would lie about having to obtain cocaine from the house.  It is not as if Dejesus was insulating himself from criminal liability by going through a third party; he was still the ultimate deliveryman.  Ortiz fails entirely to articulate a reason why Dejesus would want to mislead the undercover officer and the CS or to falsely incriminate the occupants of the house.

[16] In addition to attacking Dejesus' reliability, Ortiz emphasizes the fact that the second and third buys were not "controlled" in the traditional sense, that is, Dejesus was not cooperating with law enforcement and was not searched or interviewed before or after the buys.  He cites our decision in *Mills v. State*, where we held that "where the controls are adequate, the affiant's personal

observation of a 'controlled buy' may suffice as grounds for a finding of probable cause." 379 N.E.2d 1023, 1026, 177 Ind. App. 432, 435 (1978). But that merely means that observation of a controlled buy is one way of establishing probable cause in drug-dealing cases; we certainly did not hold that it is the **only** way.

[17] In light of the detailed facts stated in the undercover officer's affidavit and the reasonable inferences therefrom, the magistrate was fully justified in concluding that there was a fair probability that contraband or evidence of a crime would be found in the house. *See Jaggers*, 687 N.E.2d at 181. We therefore affirm the trial court's decision to allow the fruits of the search into evidence.[1]

## II. Sufficiency of the Evidence

[18] Ortiz also argues that even if the search was proper, the State failed to prove that he was in possession of the drugs that were found. In reviewing the sufficiency of the evidence supporting a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Wilson v. State*, 39 N.E.3d 705, 716 (Ind. Ct. App. 2015), *trans. denied*. We do not reweigh the evidence or assess witness credibility. *Id.* We consider conflicting

---

[1] The State also asserts that even if the search warrant had been defective, the trial court's admission of the evidence would have been proper under the good-faith exception to the exclusionary rule. *See Jaggers*, 687 N.E.2d at 184 ("[T]he exclusionary rule does not require the suppression of evidence obtained in reliance on a defective search warrant if the police relied on the warrant in objective good faith."). We are inclined to agree with the State (particularly in light of Ortiz's decision not to file a reply brief), but because we conclude that the search warrant was not defective, we need not address this alternative ground.

evidence most favorably to the verdict. *Id.* We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id.* The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.* Where, as here, the State does not allege actual possession, it must establish constructive possession. *Henderson v. State*, 715 N.E.2d 833, 835 (Ind. 1999). "Constructive possession occurs when somebody has the intent and capability to maintain dominion and control over the item." *Id.*

[19] Turning first to the capability prong, Ortiz acknowledges that "[p]roof of a possessory interest in the premises where the drugs are found is adequate to show the capability to maintain control and dominion of the items in question." Appellant's Br. p. 18 (citing *Davenport v. State*, 464 N.E.2d 1302, 1307 (Ind. 1984)). He argues, however, that the State failed to prove that he had a "possessory interest" in the house. We disagree. The most probative piece of evidence that Ortiz had a possessory interest in the house, and was not just a visitor, is a cable bill sent to "Ricardo Ortiz" at the address of the house. The fact that he was found in the master bedroom at 10:25 p.m. is also a solid indicator that he had a possessory interest in the house. Tellingly, Ortiz does not address either piece of evidence in his "capability" analysis. Also found in the bedroom were three documents naming "Ricardo Ortiz Cotto" or "Ricardo O Cotto" at the same address, along with multiple pairs of men's pants. All of

this evidence supports the conclusion that Ortiz was in possession of the house and was therefore capable of maintaining dominion and control of the drugs.

[20] To prove that Ortiz had the intent to do so, the State had to demonstrate his knowledge of the drugs. *See Henderson*, 715 N.E.2d at 835. Where a defendant's control over the premises is non-exclusive, as was the case here (since there was another person found in the master bedroom with Ortiz), there must be "evidence of additional circumstances pointing to the defendant's knowledge of the presence of the contraband." *Id*. at 835-36 (quoting *Woods v. State*, 471 N.E.2d 691, 694 (Ind. 1984)). Examples of such circumstances are: (1) incriminating statements by the defendant, (2) attempted flight or furtive gestures, (3) location of substances like drugs in settings that suggest manufacturing, (4) proximity of the contraband to the defendant, (5) location of the contraband within the defendant's plain view, and (6) the mingling of the contraband with other items owned by the defendant. *Id*.

[21] Several such circumstances existed in this case. First, while Ortiz did not attempt to flee or make any furtive gestures, he did fail to answer the door when the officers knocked. Second, the presence of the scales and the plastic bags suggests drug "manufacturing," which by statute includes "packaging or repackaging." *See* Ind. Code § 35-48-1-18 (defining "manufacture"). Third, the cocaine was found in a dresser in the master bedroom and the marijuana was found in the master bathroom, both in close proximity to Ortiz. Fourth, the bags containing the marijuana were plainly visible in the pocket of a robe in the master bathroom, which, again, could only be accessed through the master

bedroom. Fifth, the cocaine was found in a dresser that also contained mail for Ortiz, along with the scales and plastic bags. Sixth, in a box in the master-bedroom closet, officers found $100 of the buy money that had been given to Dejesus earlier that night. In light of these facts, we decline to disturb the jury's conclusion that Ortiz had the intent to maintain dominion and control of the drugs.

[22] Affirmed.

Bradford, J., and Brown, J., concur.