## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 14 2020, 9:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald J. Frew
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Angela N. Sanchez
Assistant Section Chief, Criminal
Appeals
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| T.W., <br> *Appellant-Respondent,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Petitioner* | July 14, 2020 <br><br> Court of Appeals Case No. <br> 19A-JV-3028 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Andrea R. Trevino, Judge <br><br> The Honorable Carolyn S. Foley, Magistrate <br><br> The Honorable Daniel G. Pappas, Magistrate <br><br> Trial Court Cause No. <br> 02D07-1908-JD-703 |

**Crone, Judge.**

# Case Summary

[1]   T.W. was adjudicated delinquent for conduct amounting to level 5 felony robbery and class A misdemeanor dangerous possession of a firearm. He appeals, challenging the sufficiency of the evidence to support his delinquency adjudication for dangerous possession of a firearm and claiming that his adjudications for that offense and robbery violate double jeopardy principles. He also challenges his placement in the Indiana Department of Correction (DOC). We affirm.

# Facts and Procedural History

[2]   On May 21, 2003, T.W. was born with a heart condition that required two surgeries during his first year. On May 19, 2019, he underwent aortic valve surgery at Riley Hospital in Indianapolis. He was scheduled for several postoperative appointments and attended the first but left the hospital before tests could be performed. He did not attend the remaining appointments scheduled for May and June 2019. T.W. also suffers from a nerve and tendon condition that has resulted in his wearing casts on his legs and likely will require surgery. He has been diagnosed with oppositional defiant disorder and attention deficit hyperactivity disorder (ADHD). Although he was a high school junior by age, he had accumulated only eight credits as of the fall of 2019.

[3] At age eleven, T.W. began using marijuana regularly. Prior to the current case, he accumulated fourteen criminal delinquency referrals, which included true findings for conduct amounting to disorderly conduct, possession of paraphernalia, domestic battery, and dangerous possession of a firearm.

[4] On June 18, 2019, T.W. arranged to purchase a vape pen from seventeen-year-old K.P. K.P. had not previously met T.W., who identified himself as "Fesmob," but they conversed on Snapchat and arranged a meeting place. Around dinnertime, T.W. contacted K.P. and told her to be at the rendezvous spot in about twenty minutes. K.P. drove her vehicle to the Fort Wayne street address that T.W. had provided. She was accompanied by her boyfriend, A.R., who sat in the front passenger seat, and her brother, J.P., who sat in the back passenger seat. She parked her vehicle along the side of the street, and T.W. exited a vehicle parked across the street facing hers. Three or four other persons were in T.W.'s vehicle. K.P. recognized T.W. by his neck tattoos, one of which said, "R.I.P." followed by a person's name. Tr. Vol. 2 at 11. She and her passengers noticed that T.W. walked with an unusual gait and appeared to have leg braces under his slacks. As T.W. got closer to the vehicle, A.R. recognized him as someone that he was familiar with and knew to be involved in bad activities. He urged K.P. to drive away, but just then, T.W. opened the back driver's-side door and cocked the handgun he was carrying. He said, "Run me your pockets and hurry up before I blow this bitch up." *Id*. at 11-12, 27, 48-49. He demanded that K.P., A.R., and J.P. (collectively the Victims) hand him their cell phones. They complied, and then he ordered them to unlock/reset the

phones, which they did. He took K.P.'s and A.R.'s phones but left J.P.'s older-model phone and the vape pen behind. He also took ten dollars in cash that K.P. had with her phone and said, "Nice doing business with you." *Id*. at 13, 50. He returned to his vehicle, which his companions had pulled up near K.P.'s vehicle, and then left the area.

[5] That evening, the Victims reported the robbery to their parents and to police. Each separately identified T.W. from a photo array. The firearm was never recovered. Ten days after the robbery, T.W., who had failed to attend follow-up appointments with his cardiac surgeon, became septic. He underwent emergency surgery and was hospitalized until the end of August 2019.

[6] On September 25, 2019, the State filed a juvenile delinquency petition alleging that T.W. committed acts amounting to level 5 felony robbery if committed by an adult and class A misdemeanor dangerous possession of a firearm.[1] During September, T.W. failed three drug screens, each time testing positive for THC. During his factfinding hearing, T.W. denied that he committed the robbery, claiming that he was too ill to have done so. The Victims testified concerning T.W.'s distinct neck tattoos and gait and stated that they were 100% certain that T.W. was the person who robbed them. T.W. acknowledged having a neck

---

[1] Dangerous possession of a firearm, by definition, is committed by a child and thus not properly stated as conduct amounting to dangerous possession of a firearm if committed by an adult. *J.R. v. State*, 100 N.E.3d 256, 257 n.1 (Ind. 2018).

tattoo that says, "R.I.P. Darius." *Id*. at 109-10. The trial court entered true findings on both allegations.

[7] During the dispositional hearing, T.W. and his mother asked that he be placed at home on electronic monitoring. Finding that T.W. posed a danger to the community, the trial court ordered that he be placed in the DOC. At the close of the hearing, the court indicated that it would make a specific recommendation that T.W. be placed in the Pendleton facility, where medical personnel could best attend to his special needs. T.W. now appeals. Additional facts will be provided as necessary.

## Discussion and Decision

## Section 1 – Sufficient evidence supports T.W.'s true finding for dangerous possession of a firearm.

[8] T.W. challenges the sufficiency of the evidence to support his true finding for dangerous possession of a firearm. Juvenile court proceedings are civil, not criminal, in nature. *J.S. v. State*, 110 N.E.3d 1173, 1175 (Ind. Ct. App. 2018), *trans. denied* (2019). Nevertheless, in a juvenile delinquency adjudication, the State must prove beyond a reasonable doubt that the juvenile committed acts amounting to the charged offense if committed by an adult. *T.G. v. State*, 3 N.E.3d 19, 23 (Ind. Ct. App. 2014), *trans. denied*. When reviewing claims of insufficient evidence with respect to delinquency adjudications, we neither reweigh evidence nor reassess witness credibility. *Id*. Rather, we examine the evidence and reasonable inferences most favorable to the judgment and will

affirm if substantive evidence of probative value establishes every material element of the offense. *Id.*

[9] Indiana Code Section 35-47-10-5(a) reads, in relevant part, "A child who knowingly, intentionally, or recklessly possesses a firearm for any purpose other than a purpose described in section 1 of this chapter commits dangerous possession of a firearm, a Class A misdemeanor." The exceptions outlined in Indiana Code Section 35-47-10-1 include a child's possession of a firearm while attending a hunters or firearm safety course, attending a target shooting activity or organized and supervised competition at an established range, engaging in licensed hunting/trapping, transporting an unloaded firearm to or from one of the aforementioned activities, or while at home or on his property under a parent's or guardian's supervision. To satisfy its burden of proof, the State must establish that the juvenile actually or constructively possessed the firearm. *K.F. v. State*, 961 N.E.2d 501, 509 (Ind. Ct. App 2012), *trans. denied*.

[10] T.W. maintains that the State failed to prove each element of the dangerous possession of a firearm offense beyond a reasonable doubt. He briefly renews his mistaken identity claim from below, stating simply that no firearm was ever recovered and that the State's case relied largely on the Victims' testimony concerning his identity as the perpetrator. Appellant's Br. at 15. He has failed to develop a cogent argument as required by Indiana Appellate Rule 46(A)(8), and we therefore decline to address it. *D.E. v. State*, 962 N.E.2d 94, 96 n.6 (Ind. Ct. App. 2011). Notwithstanding, we note that addressing the argument would

require us to reweigh evidence and reassess credibility, which we may not do. *T.G.*, 3 N.E.3d at 23.

[11] T.W. also suggests that the evidence is insufficient because the State failed to prove that he did *not* fall within one of the exceptions found in Indiana Code Section 35-47-10-1. In making this argument, he does not allege that he, in fact, fell within one of the exceptions but simply that the State failed to disprove that he did. He cites no authority to support the proposition that the State had this burden, and we do not find any cases supporting it. The State analogizes the circumstances to those in which an adult is charged with carrying a handgun without a license: "Once the State demonstrates that [an adult] defendant had possession of a handgun on his body or in a vehicle, it then becomes the defendant's burden to demonstrate [as an affirmative defense] that he had a valid license to carry the handgun." *Wilson v. State*, 39 N.E.3d 705, 717 (Ind. Ct. App. 2015). We see no reason why this rationale should not be applied to juveniles facing allegations of dangerous possession of a firearm, once the State has presented probative evidence that the child knowingly, intentionally, or recklessly possessed the firearm.[2]

[12] Even so, T.W. concedes "that a fair appraisal of the testimony presented at trial would support the conclusions that the relevant exceptions provided under I.C.

---

[2] The application of the *Wilson* rationale to juveniles is particularly compelling in cases such as this, where T.W.'s sole defense below was mistaken identity, which is incongruous with a claim of carrying the firearm for some ostensibly legitimate reason and therefore would not naturally lead the State to question him regarding his purpose for possessing the firearm.

§ 35-47-10-1 were, in all likelihood, not present and the testimony of the acts presented at factfinding." Appellant's Br. at 15. The foregoing evidence supports that appraisal.

## Section 2 – T.W.'s delinquency adjudications do not violate double jeopardy principles.

[13] T.W. also contends that the trial court violated double jeopardy principles in adjudicating him delinquent for acts amounting to robbery and dangerous possession of a firearm. Double jeopardy principles apply in juvenile delinquency adjudications. *H.M. v. State*, 892 N.E.2d 679, 681-82 (Ind. Ct. App. 2008), *trans. denied*. In his concurring opinion in *Richardson v. State*, 717 N.E.2d 32, 55-56 (Ind. 1999), Justice Sullivan articulated circumstances in common law often described as double jeopardy but not governed by the constitutional tests set forth by the majority in *Richardson*. Among those is "[c]onviction and punishment for a crime which consists of the very same act as an element of another crime for which the defendant has been convicted and punished." *Id*. at 55 (Sullivan, J., concurring).

[14] Here, the State alleged in the delinquency petition that T.W. committed delinquent acts amounting to level 5 felony robbery if committed by an adult by "knowingly or intentionally tak[ing] property to wit: one or more cellular telephone(s) and/or a vape pen and/or U.S. currency, from the person or presence of [the Victims] by using or threatening the use of force." Appellant's App. Vol. 2 at 36 (citing Ind. Code § 35-42-5-1(a)(1)). With respect to dangerous possession of a firearm, the State alleged that T.W. "knowingly,

intentionally or recklessly possess[ed] a firearm for any purpose other than a purpose described in Indiana Code Section 35-47-10-1." *Id*. (citing Ind. Code § 31-37-1-2).

[15] T.W. asserts that the instrument of "force" for purposes of the robbery allegation was the same firearm that he was accused of dangerously possessing. Even if the firearm was the source of the force used to commit the robbery, double jeopardy principles are not implicated here for two reasons. First, the delinquency order indicates that T.W. was charged and found true as to robbery as a level 5 felony, not as a level 3 felony for circumstances involving the use of a firearm. Appealed Order on Factfinding at 1; Ind. Code § 35-42-5-1(a)(1). Thus, T.W.'s robbery adjudication did not require proof of possession of a firearm, and the record shows that he verbally threatened the Victims during the robbery. Second, T.W.'s possession of the firearm involves not only the moment of the robbery but also before he entered the Victims' vehicle and after he left it. In other words, "[c]arrying the gun along the street was one crime and using it was another." *Guyton v. State*, 771 N.E.2d 1141, 1143 (Ind. 2002) (quoting *Mickens v. State*, 742 N.E.2d 927, 931 (Ind. 2001)). T.W.'s adjudications do not violate double jeopardy principles.

## Section 3 – The trial court acted within its discretion in placing T.W. in the DOC.

[16] Finally, T.W. challenges his placement in the DOC. The disposition of a juvenile adjudicated a delinquent is a matter committed to the trial court's discretion, subject to the statutory considerations of the child's welfare,

community safety, and the policy favoring the least harsh disposition. *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010). We review the trial court's disposition for an abuse of discretion, which occurs if its decision is clearly against the logic and effect of the facts and circumstances before it or the reasonable inferences that may be drawn therefrom. *Id.*

[17] "[T]he goal of the juvenile process is rehabilitation so that the youth will not become a criminal as an adult." *J.S.*, 110 N.E.3d at 1175-76 (quoting *R.H.,* 937 N.E.2d at 388). Thus, juvenile courts have a variety of placement choices. *Id.* at 1176. Indiana Code Section 31-37-18-6 reads,

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:
>
> (A) in the least restrictive (most family like) and most appropriate setting available; and
>
> (B) close to the parents' home, consistent with the best interest and special needs of the child;
>
> (2) least interferes with family autonomy;
>
> (3) is least disruptive of family life;
>
> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and

(5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

Indiana Code Section 31-37-18-9(a)(5) requires the trial court to state its reasons for the disposition chosen. This involves the trial court's issuance of written findings and conclusions concerning the child's care, treatment, rehabilitation, or placement; parental participation in the plan; efforts made to prevent the child's removal from the parent; family services offered; and the court's reasons for its disposition.

[18] Below, T.W. and his mother asked that he be put on home placement with electronic monitoring. In ordering placement in the DOC, the trial court specifically found that T.W. posed "a danger to the community." Appealed Dispositional Order at 2. The court incorporated into its order the predispositional order, as well as the reports and recommendations from the county juvenile center, the placement board, and the psychological evaluation. The probation department, placement board, and psychological evaluation all recommended that T.W. be placed in the DOC. The defense stipulated to the reasonable efforts made to prevent T.W.'s removal from his mother, including the use of an electronic monitoring device, drug and alcohol groups, a thinking errors program, and a psychological evaluation.

[19] In the dispositional order, the trial court articulated the following reasons for placement in the DOC: T.W.'s extensive history of delinquent behavior, with fifteen juvenile referrals in six years and conduct that is "chronic and escalating," e.g., recent delinquency findings for domestic battery and another

firearms possession offense; the serious nature of his current true finding for conduct amounting to felony robbery and involving his use of a firearm; his attitude in minimizing his delinquent behavior and his corresponding need to learn the logical and natural consequences of such behavior; his ample opportunities to alter his behavior; his need for a highly structured environment; his negative peer relationships in the local community; the lack of parental control over his behavior; his educational deficiencies and the need for a structured educational environment offered in the DOC so he can earn enough credits to graduate from high school; and, most importantly, the overall need to protect T.W. and the community and to advance his best interests. *Id.* at 1-2; *see K.A. v. State*, 775 N.E.2d 382, 387 (Ind. Ct. App. 2002) ("[I]n certain situations the best interest of the child is better served by a more restrictive placement."), *trans. denied*.

[20] T.W. asserts that the trial court failed to consider his serious medical conditions before placing him in the DOC, the most restrictive placement. We acknowledge that the dispositional order does not specifically mention his medical issues, but the trial court specifically addressed T.W.'s special medical circumstances in its comments at the close of the dispositional hearing. The court described T.W.'s case as involving some of the most difficult choices it had ever had to make in six years on the bench. The court considered the facilities and nursing care at the Pendleton juvenile facility as well as its proximity to hospitals and made an unprecedented request that T.W. be placed in that facility. The court emphasized its duty to resolve T.W.'s case pursuant

to the statutory considerations, and at the same time assured T.W.'s mother as follows:

> I want you to know that he'll be taken care of, well taken care of. They'll tend to the medical needs of him. I am not finding that his, the ease to which he can get to Riley Hospital, or Anderson, or wherever, that's not a factor in my decision here today. My, my job is to protect the community and, and to try to assist him in getting services. To the extent that it's easier to get to Riley, that's not something that I would be comfortable making a finding of, and that's the reason I'm committing him to the Department of Corrections. I'm not committing him to the Department of Corrections because it's going to get him medical services more easily. I want to be clear on that. I'm committing him there because he should be there, based upon my review of the record in this case. They will make a determination as to when he gets released. That's not up to me, okay, just so you know. And I don't commit him for a determinate period of time. In other words, I don't say you're going there for a year, you're going there for two years or three years. I'm not doing that. I'm sending him to them. They will review his, his, his physical situation, his history, they'll review all those things. And they'll make a determination as to what's best for him.

> ....

> I've never recommended a placement in an order before, but I will, I will in this instance recommend, for a number of reasons, much more modern facility [in Pendleton], probably better able to accommodate him in a wheelchair.

Tr. Vol. 4 at 25, 27.

[21]    In sum, the dispositional order and transcript reveal that the trial court made a well-considered, if not agonizing, decision in placing T.W. in the DOC with a

special request for placement in Pendleton's juvenile facility. Based on the foregoing, we find no abuse of discretion in its decision to do so. Accordingly, we affirm.

[22] Affirmed.

Bailey, J., and Altice, J., concur.